IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GUY F. MILITELLO,** | : | |
| | : | **Civil No. 1:14-cv-0240** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ALLSTATE PROPERTY AND** | : | |
| **CASUALTY INSURANCE CO.,** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendant** | : | |

## M E M O R A N D U M

In this breach of contract and bad faith action, Plaintiff alleges that his

property insurance company failed to accurately assess and pay a covered loss, and

made false representations for the purpose of denying the full value of his claim.

Presently before the court is Defendant's motion for summary judgment, wherein it

seeks judgment as a matter of law on both claims (Doc. 35.)  For the reasons set

forth below, the motion will be granted in part and denied in part.


**I.**      **Background**

The following facts are undisputed or, where disputed, reflect Plaintiff's

version of facts in the record, pursuant to this court's duty to view all facts and

reasonable inferences in the light most favorable to the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    **Facts**

Plaintiff Guy Militello ("Plaintiff") owns property located within the Middle District of Pennsylvania, consisting of a personal residence and an equestrian aquatics pool barn that has five horse stalls and a swimming pool specifically designed for training horses.  (*See* Doc. 35-4 at pp. 19-20 of 171; Doc. 35-19.)  At all times relevant hereto, the property was insured by Defendant Allstate Property Insurance Company ("Defendant").  On October 5, 2012, Plaintiff reported a loss to Defendant after a horse struck a center support column of the pool barn, resulting in significant structural damage to the property.  (Doc. 30, ¶¶ 5-10.)  In response to the claim, Defendant retained engineer David Aufiero ("Aufiero"), of Eugene J. Aufiero & Associates, Inc., to investigate the loss.  (*See* Doc. 35-7, pp. 6-10 of 45.)  On October 11, 2012, Aufiero submitted a report to Defendant, in which he opined that "the structural construction deficiencies relating to the roof framing system caused the building collapse to occur when no live loads were present on the roof."  (Doc. 35-10, p. 3 of 3.)  Relying on Aufiero's report, Defendant denied Plaintiff's claim by letter dated October 12, 2012, citing language in the insurance policy that excludes losses caused by "collapse" and by "faulty, inadequate or defective" construction.[1]  (*See* Doc. 35-11, p. 2 of 8.)

---

[1] The policy language cited by Defendant provides, in pertinent part, as follows:

At Plaintiff's request, Defendant provided him with a copy of the insurance policy, the denial letter, and Aufiero's report, and three days later, Plaintiff informed Defendant that, after he submitted his initial claim, he learned that his ranch hand was attempting to repair the roof of the structure when it collapsed.  (Doc. 35-7, p. 12 of 45.)  Because this new information potentially brought the claim outside of the policy's collapse exclusion,[2] Defendant reopened Plaintiff's claim and had Aufiero re-inspect the loss.  (Doc. 35-7, p. 13 of 45.)  On

---

Planning, Construction or Maintenance, meaning faulty, inadequate or defective:

a) planning, zoning, development, surveying, siting;
b) design, specifications, workmanship, repair, construction, renovation, modeling, grading, compaction;
c) materials used in repair, construction, renovation or remodeling; or
d) maintenance of property whether on or off the residence premises by any person or organization.

(Doc. 35-11, p. 3 of 8.)

[2] The insurance policy provides coverage for collapse in limited circumstances.  Specifically, the insurance policy states as follows:

For coverage to apply, the collapse of a building structure specified in a) or b) above must be a sudden and accidental direct physical loss caused by one or more of the following:

a)  defective methods or materials used in construction, repair, remodelling or renovation, but only if the collapse occurs in the course of such construction, repair, remodelling or renovation.

(Doc. 35-8, p. 15 of 31.)

October 22, 2012, Aufiero again concluded that the loss resulted from structural deficiencies in the roof framing system.  (Doc. 35-12, p. 3 of 4.)

While the investigation into Plaintiff's claim was still ongoing, Plaintiff's counsel, Angelo Perrucci, Esq. ("Attorney Perrucci"), advised Defendant by letter dated December 28, 2012, that he had been retained to represent Plaintiff in the matter and that Aufiero's October 22, 2012 report was inaccurate and "border[ed] on fraudulent."  (Doc. 35-15, p. 2 of 3.)  Attorney Perrucci enclosed with his letter an estimate Plaintiff had received to repair the damages sustained to the property and demanded payment in the amount of $283,000.00 within ten days.  (*Id.*)  In response, the adjuster on the claim, George Miller ("Mr. Miller"), provided Attorney Perrucci with Defendant's counter-estimate of the loss and informed him that Defendant intended to make a payment on the claim.  (*See* Doc. 35-7, p. 30 of 45; Doc. 35-16, p. 2 of 2.)  On February 2, 2013, Defendant issued a check to Plaintiff in the amount of $102,328.19, which Plaintiff cashed on February 7, 2013.  (Doc. 35-18.)

Two weeks after Defendant issued its payment, Attorney Perrucci provided Defendant with an additional estimate indicating that it would cost $202,516 to repair the pool barn.  (Doc. 35-19.)  In an effort to resolve the claim, Mr. Miller sent a letter to Attorney Perrucci requesting an appraisal, pursuant to

4

language in the policy which contemplates an appraisal in the event the parties fail
to agree on the amount of a loss.  That language provides as follows:

> If you and we fail to agree on the amount of loss, either party may
> make written demand for an appraisal.  Upon such demand, each
> party must select a competent and impartial appraiser and notify
> the other of the appraiser's identity within 20 days after the
> demand is received.  The appraisers will select a competent and
> impartial umpire.  If the appraisers are unable to agree upon an
> umpire within 15 days, you or we can ask a judge of a court of
> record in the state where the residence premises is located to
> select an umpire.  The appraisers shall then determine the amount
> of loss, stating separately the actual cash value and the amount of
> loss to each item.  If the appraisers submit a written report of an
> agreement to you and to us the amount agreed upon shall be the
> amount of loss.  If they cannot agree, they will submit their
> differences to the umpire.  A written award agreed upon by any
> two will determine the amount of loss.  Each party will pay the
> appraiser it chooses, and equally bear expenses for the umpire and
> all other appraisal expenses.

(Doc. 35-21.)

Thereafter, by letter dated March 19, 2013, Mr. Miller sent a letter to
Attorney Perrucci identifying Joe Hess ("Mr. Hess") as Defendant's appraiser.
(Doc. 35-22; *see also* Doc. 35-24.)  In response, by letter dated March 21, 2013,
Attorney Perrucci provided Mr. Miller with an estimate from Plaintiff's contractor
for the "upcoming meeting with respect to resolving this issue."  (Doc. 35-25.)
On April 4, 2013, Defendant's appraiser informed Mr. Miller that he had been in
contact with Plaintiff's appraiser and that both appraisers were in the process of
agreeing on an umpire pursuant to the terms of the policy.  (Doc. 35-26.)

However, prior to any such appraisal, Attorney Perrucci informed Mr. Miller by letter dated April 10, 2013, that there had been a misunderstanding regarding the appraisal process and that "[n]either [Plaintiff] nor [Attorney Perrucci] were interested in a formal appraisal/refereeing proceeding." (Doc. 35-27.) Specifically, Attorney Perrucci stated:

> Please accept this letter as notice of a communication failure between you and I with respect to the informal meeting I requested between our experts at the Militello property. Neither my client nor I are interested in a formal appraisal/refereeing proceeding. I simpl[y] wanted the experts to get together to discuss their opinion and to look for common grounds. It appears that you have something different in mind. Once again I am forwarding my client['s] work estimate to you for your review. Kindly review the estimate supplied and advise whether Allstate Insurance Company is willing to pay some or all of the additional monies requested. If I do not receive a response from you by Wednesday, April 17th, 2013, I will be preparing the necessary complaint and proceed through the courts.

(*Id.*)

In response to the letter, and in an apparent attempt to have the appraisers find "common ground," Mr. Miller sent Mr. Hess to the property to conduct an appraisal. (*See* Doc. 35-28.) By email dated May 8, 2015, Mr. Hess informed Mr. Miller that he "met with [Plaintiff] and his attorney and contractor on [April 23, 2013]," and was in the process of preparing his estimate. (Doc. 35-29.) Thereafter, Hess valued the full replacement cost of the loss to be $130,173.98,

which amounted to an additional $7,506.33 owed to Plaintiff.  (Doc. 35-30.)  On

June 23, 2013, Defendant issued a check to Plaintiff in that amount, accompanied

by a letter from Mr. Miller outlining the calculations that summarized the parties'

"settlement agreement."  (Doc. 35-31, pp. 2-3 of 4; Doc. 35-7, p. 39 of 45.)

Plaintiff initially rejected the check and returned it to Defendant, only to then

change his mind and request that Defendant reissue it.  (Doc. 35-7, pp. 40-41 of

45.)  The $7,056.33 check was subsequently cashed on July 26, 2013.  (*Id*. at p. 4

of 4.)  After receiving the additional payment from Defendant, Attorney Perrucci

marked the matter "Settl[ed]" "[p]rior to suit" on his contingent fee closing

statement.  (Doc. 35-32.)

Nevertheless, on October 2, 2013, Plaintiff, through his new legal

counsel, Edward J. Coyle, Esquire ("Attorney Coyle"), filed suit against Defendant

in the Court of Common Pleas of Lebanon County alleging, *inter alia*, breach of

contract and bad faith.  (Doc. 1-1.)  On October 15, 2014, Attorney Coyle informed

Defendant that Plaintiff was now receptive to the idea of resolving the matter

through appraisal "in order to short circuit the litigation process," and requested the

pertinent policy provisions governing the process (Doc. 35-33), which Defendant

provided.  At some point thereafter, the parties agreed to proceed to appraisal.

Prior to the appraisal, however, a dispute arose as to whether the

appraisal would resolve the entire matter, including Plaintiff's bad faith claim.  By

letter dated November 25, 2014, Defendant's attorney, Christian Labletta

("Attorney Labletta"), advised Attorney Coyle of his belief that Defendant's

"willing[ness] to put this matter back into appraisal was premised upon [Plaintiff's]

willingness to resolve the entire lawsuit."  (Doc. 35-37.)  Attorney Coyle

responded that resolving the matter through appraisal was not contingent on

Plaintiff dropping the bad faith claim, and stated that any suggestion to the

contrary was, "in and of itself . . . bad faith."  (Doc. 35-38.)  Despite this

disagreement, Attorney Labletta confirmed that Defendant would move forward

with the appraisal process while the civil action remained pending.  (*See* Doc. 35-

40.)

Because discovery in the underlying civil action was ongoing, Attorney

Miller took the deposition of Plaintiff on February 11, 2015, and that same day,

Attorney Coyle took the depositions of Mr. Miller and Defendant's engineer,

David Aufiero.  Two weeks later, on February 24, 2015, Defendant took the

deposition of Plaintiff's contractors, Mickey Rapp ("Rapp") and Scott Van Dine

("Van Dine"), who had prepared estimates for Plaintiff during the initial

adjustment of the insurance claim.

In his deposition, Plaintiff denied that he ever used the pool barn for

business or commercial purposes.  (Militello Dep. at p. 53 of 112.)  Specifically,

Plaintiff testified as follows:

Q:   Is the property currently being used as a business?

A:   No.

Q:   For any point in time from when you first purchased it in 2007 until the present, has it ever been used as a business?

A:   Never.

(*Id.* at p. 107 of 112.)  This testimony was consistent with Plaintiff's statement under oath, wherein he testified that he "never" used the barn for commercial purposes and explained that the horses were his "own personal horses."  (Doc. 35-4, p. 53 of 171.)

Plaintiff's testimony, however, was directly contradicted by the contractors he hired to repair the premises.  Specifically, Rapp testified that Plaintiff advised him that he used the structure for business, and that he was losing $32,000 a day while the structure remained in disrepair because the horses could not use the pool.  (Rapp Dep. at p. 27 of 51.)  Rapp further testified that Plaintiff asked him to alter the language in his estimate to no longer include the word "commercial" as a description for the premises.  (*Id.* at pp. 28-29 of 51.)  Van Dine likewise testified that Plaintiff's "main concern was the money [he] was losing in business from those horses per week and month," and that Plaintiff told him that they needed to get the structure "up and running" quickly because "this was his business." (Van Dine Dep. at pp. 27, 71 of 115.)  In addition, Van Dine testified

that Plaintiff altered his estimates in order to recover more money from Defendant.

For example, Van Dine testified as follows regarding one such estimate:

> A:  These numbers are way too high.
>
> Q:  But it is on your letterhead, correct?
>
> A:  Yes.
>
> Q:  Why are these numbers too high?
>
> A:  Because I could do it for a lot less than that.  [Militello] changed the numbers.
>
> Q:  Mr. Militello changed the estimate?
>
> A:  Yes, he did.
>
> Q:  Can you tell me how he changed the estimate?
>
> A:  He asked me, he said, Scott, this is what I want you to do. This didn't cost anything near – I said, how are you going to get $400,000?  You can build a condominium for that.  And he said, I tell you, they are going to give it to me.  And I said, you are out of your mind.
>
> Q:  How did [Plaintiff] change the numbers?  Was this estimate emailed to him?
>
> A:  Yes, it was.
>
> Q:  Was it emailed to him in a document that was –
>
> A:  PDF.
>
> Q:  Was it emailed in a way that he could change the numbers?

A:   Yes, because you can go to editing when you send it over a
document on my files.  If you want to edit it, you can edit it.

(*Id.* at pp. 49-50 of 115.)

Following the February 24, 2015 depositions, Mr. Miller sent a letter to

Attorney Coyle advising him that Defendant was withdrawing from the appraisal

process based upon the depositions of Rapp and Van Dine.  (Doc. 35-43.)  Mr.

Miller explained as follows:

> Mr. Van Dine testified at his deposition that Mr. Militello
> told him that he was operating a business from the property.  In
> addition, Mr. Van Dine testified that Mr. Militello personally
> made changes to the estimate including increasing the total value
> of the estimate.  Mr. Van Dine testified that the estimate changed
> by Mr. Militello dramatically increased the total cost of repairs
> and is not an accurate reflection of the amount of damage to the
> property.

> Likewise, Mr. Rapp testified that Mr. Militello told him
> that he was operating a business from the property.  Mr. Rapp also
> testified that Mr. Militello requested certain changes to the
> estimate, including deletion of the term "commercial aquatic
> horse therapy center."

> As you know, Mr. Militello testified at his deposition and
> examination under oath that he never operated a business at the
> property.  The insurance policy does not provide coverage for
> structures used for business purposes.  Based upon the deposition
> testimony of these two independent witnesses, Defendant will not
> be issuing any additional monies on the claim through the
> appraisal process.  Rather, Defendant will be petitioning the court
> to amend its answer to include a counterclaim for insurance fraud.

(*Id.*)[3]

On March 2, 2015, Attorney Coyle responded via email to Mr. Miller's letter, stating:

> I received your letter of February 27, 2015 informing me of Defendant's withdrawal from the appraisal process.
>
> First, if I do not hear from you by the close of business on Tuesday March 3, 2015, I will assume that Defendant/Defendant's appraiser do not intend to participate further in the appraisal process. At that point, I will be instructing my appraiser to begin the involvement of the previously agreed neutral. Defendant certainly has the right to not participate, but it does not have the right to discontinue the process.

(Doc. 35-44.)

On March 11, 2015, Counsel for the parties then engaged in an email exchange on March 11, 2015, wherein Attorney Coyle again informed Defendant that he "fully intends to complete the appraisal process" (Doc. 35-45), to which Attorney Labletta responded by reiterating Defendant's reasons for withdrawing from the appraisal

---

[3] The insurance policy includes a contract exclusion with regard to "Other Structures Protection" which states, in part:

> Property We Do Not Cover Under Coverage B:
> 1.   Structures used in whole or in part for business purposes.

(Doc. 35-8, p. 7.)

The policy defines "business" as:

> a)      any full-time or part-time activity of any kind engaged in for economic gain including the use of any part of any premises for such purposes […]

(*Id.* at 2.)

process (Doc. 35-46).  In reply, Attorney Coyle again indicated his intent to

proceed to the "contractually agreed upon" appraisal with or without Defendant's

participation.  (Doc. 35-47.)  In response, Attorney Labletta advised:

> We did agree to appraisal.  However, at the time we agreed to
> appraisal we believed it was a covered, legitimate claim and the
> only dispute between the parties was the amount to repair the
> property.  Now, based upon the testimony of the contractors
> retained by [Plaintiff], we now know that the claim is not covered
> under the policy because he was operating a business.

(Doc. 35-48.)

## B.   **Procedural History**

Plaintiff initiated this lawsuit on January 16, 2014 by filing a three-count

complaint in the Court of Common Pleas of Lebanon County, Pennsylvania, for

breach of contract (Count I), breach of the Unfair Trade Practices and Consumer

Protection Law, 73 Pa. Cons. Stat. § 201-1 ("UTPCPL") (Count II), and statutory

bad faith (Count III).  (Doc. 1-1.)  Defendant removed the action to this court on

February 12, 2014.  (Doc. 1.)  On February 19, 2014, Defendant filed a motion to

dismiss Plaintiff's bad faith and UTPCPL claims (Doc. 2) and, in response,

Plaintiff filed an amended complaint on March 5, 2014[1] (Doc. 3).

On March 19, 2014, Defendant filed a motion to dismiss and a motion to

strike pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f), seeking to

---

[1]  The amended complaint included the addition of paragraphs 15(a)-(e) and the incorporation of
additional provisions into paragraph 22(d).  (*See* Doc. 3)

dismiss Plaintiff's UTPCPL and bad faith claims.  After consideration of the motion, the court dismissed the UTPCPL claim without prejudice, but denied the remainder of the motion.  (Docs. 15 & 16.)

Thereafter, the parties engaged in fact discovery, which concluded on February 14, 2015.  (*See* Doc. 14, p. 2 of 8.)   On April 9, 2015, Plaintiff filed a motion for leave to file a second amended complaint, which the court granted by memorandum and order on June 16, 2015.  (Docs. 28 & 29.).  The second amended complaint, which was submitted pursuant to Local Rule 15.1, asserts an additional claim that Defendant breached the insurance contract by withdrawing from the appraisal process to which it had contractually committed.  (*Id.* at ¶¶ 27-30.)  On July 6, 2015, Defendant filed an answer to Plaintiff's second amended complaint, and asserted counterclaims for fraud and declaratory judgment.  (Doc. 32.)

On August 7, 2015, Defendant filed the instant motion for summary judgment (Doc. 35), followed by a statement of material facts (Doc. 36) and a brief in support (Doc. 42) on August 14, 2015.  On September 3, 2015, Plaintiff filed an opposition to the motion for summary judgment (Doc. 46) and counterstatement of material facts (Doc. 47).  Defendant replied on September 17, 2015.  (Doc. 52.) Thus, this matter has been fully briefed and is ripe for disposition.

## II.   <u>Legal Standard</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate when no genuine issue exists as to any material fact and when the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a). A fact is "material" if "proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case."  *Burke v. Transam Trucking, Inc.*, 605 F. Supp. 2d 647, 650 (M.D. Pa. 2009).  An issue of material fact is genuine if "the evidence is such that a reasonable jury might return a verdict for the non-moving party."  *Id.*

When considering a motion for summary judgment, a court must look beyond the pleadings and into the factual record.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The nonmoving party may not merely restate allegations made in the pleadings or rely upon factually unsupported legal conclusions.  *See id.* at 323–24.  Instead, the nonmoving party must support each essential element of its claim with specific evidence from the record.  *Id.* at 317.  All factual doubts and reasonable inferences are to be resolved in favor of the nonmoving party.  *Id.*

The moving party has the initial burden of proving that no genuine issue of material fact exists.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (U.S. 1986).  Once this burden is met, the burden shifts to the nonmoving party to produce evidence proving the existence of every essential element to its case.  *Id.*

The nonmoving party must then "go beyond the pleadings by way of affidavits, depositions . . . or the like in order to demonstrate specific material facts which give rise to a genuine issue." *Id.* at 324.  In considering a motion for summary judgment, the court is not to engage in credibility determinations or the weighing of evidence. *Burke*, 605 F. Supp. 2d at 650.  Instead, when the credibility of witnesses is at issue or when conflicting evidence must be weighed, a trial is needed. *Id.*

## III.    <u>Discussion</u>

In its motion for summary judgment, Defendant  argues that Plaintiff's breach of contract claim should be dismissed because Defendant fully satisfied the insurance claim pursuant to an agreement between the parties, or, in the alternative, because Plaintiff misrepresented material facts, rendering the policy void.  (Doc. 42, pp. 2-7 of 24.)  In addition, Defendant argues that Plaintiff's bad faith claim should be dismissed because, *inter alia*, Defendant had a reasonable basis for its claim decisions.  The Court will address these arguments in turn.

### A.    **Breach of Contract**

Jurisdiction over the instant action is based on diversity of citizenship, which requires the court to apply Pennsylvania law to Plaintiff's breach of contract claim.  *See* 28 U.S.C. § 1332(a); 28 U.S.C. § 1441(a); *Norfolk S. Ry. Co. v. Basell*

*USA Inc.,* 512 F.3d 86, 91-92 (3d Cir. 2008); *see also Regents of Mercersburg*

*Coll. v. Republic Franklin Ins. Co.,* 458 F.3d 159, 163 (3d Cir. 2006) (noting that

an insurance contract is governed by the law of the state in which the contract was

formed).  Neither party disputes the application of Pennsylvania law to this matter.

### 1.   Agreement between Defendant and Plaintiff's Attorney

Defendant argues that the parties settled Plaintiff's insurance claim prior

to the commencement of this action, thereby precluding Plaintiff from asserting a

claim for breach of contract.  Specifically, Defendant argues that the parties agreed

to settle the claim based on an estimate prepared by Defendant's appraisal and that

the settlement was finalized when Plaintiff accepted Defendant's final check in the

amount of $7,506.33.  As a result, Defendant argues that Plaintiff should not be

permitted to reap the benefits of the tendered payment, and later be permitted to

evade the obligations of that agreement.  Plaintiff, however, disputes that any such

settlement was reached, and emphasizes that a written contractual agreement was

never executed between the parties.

As Defendant points out in its motion, ordinary principles of contract

law govern settlement agreements, *Thomas v. Univ. of Pa.*, Civ. No. 06-cv-1916,

2007 WL 2891739, *2 (E.D. Pa. Oct. 2, 2007) (citing *In Re Cendant Corp. Prides*

*Litig.*, 233 F.3d 188, 193 (3d Cir. 2000)), and thus, to be enforceable, a settlement

agreement must possess all of the elements of a valid contract.  *Mazzella v. Koken*,

739 A.2d 531, 536 (Pa. 1999) (citing *Gogel v. Blazofsky*, 142 A.2d 313, 315 (Pa. 1958)).  As with any contract, it is essential to the formation of a settlement agreement that "the minds of the parties should meet upon all the terms, as well as the subject matter, of the [agreement]."  *Mazzella*, 739 A.2d at 536.  An agreement is valid if "the parties mutually assent to the terms and conditions of the settlement."  *Transp. Int'l Pool, Inc. v. Alt. Transp., Inc.*, Civ. No. 07-cv-2895, 2008 WL 2550598, *5 (E.D. Pa. June 25, 2008) (citing *Main Line Theatres, Inc. v. Paramount Film Distrib. Corp.,* 298 F.2d 801, 803 (3d Cir. 1962)).  It is not enough that the parties intended to contract; rather, "in order for there to be an enforceable contract, the nature and extent of its obligation must be certain [and] the parties themselves must agree upon the material and necessary details of the bargain."  *Bright v. First Sr. Fin. Grp.*, Civ. No. 12-cv-360, 2013 WL 3196392, *7 (E.D. Pa. June 24, 2013) (citing *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 585 (3d Cir. 2009) (quoting *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956))).  The court looks to see whether "the terms are sufficiently definite to be specifically enforced." *Id.* (quoting *Channel Home Ctrs. v. Grossman,* 795 F.2d 291, 298–99 (3d Cir. 1986)).

    As the party seeking to enforce a settlement agreement, Defendant bears the burden of proving that such an agreement was formed.  *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999).  While it is clear that the parties attempted to fully

resolve Plaintiff's insurance claim prior to suit being filed, issues of material fact remain as to whether such an agreement was actually reached.  It is undisputed that Defendant sent correspondence to Attorney Perrucci stating that, "[t]he following calculations summarize our settlement agreement," along with a check for $7,506.33.  (Doc. 35-31.)  It is also undisputed that, after some hesitation, Plaintiff accepted the payment, and that Attorney Perrucci considered the matter "settl[ed]" "[p]rior to suit."  (Doc. 35-32.)  However, as Plaintiff points out, the final check did not contain a notation indicating that the payment was being tendered as payment in full of any and all claims, and Defendant never required Plaintiff to execute a written release of claims.  (Doc. 46, p. 3 of 14.)  In addition, Defendant's own actions suggest that Defendant itself did not consider the matter settled following the issuance of the $7,056.33 payment, as  it subsequently agreed— perhaps in good faith to its customer—to  submit Plaintiff's claim to appraisal in October 2014. Because disputed issues of fact remain as to whether the parties mutually assented to the terms and conditions of a settlement, the court is compelled to find that Defendant has failed to meet its burden to show that the parties entered into a settlement agreement. The court will therefore deny Defendant's motion in this regard.

## 2.   Misrepresentation

Defendant further argues that Plaintiff's claim for breach of contract should be dismissed because Plaintiff misrepresented material facts, thereby rendering the insurance policy void.  (Doc. 42, pp. 4-7 of 24.)  In support of its argument, Defendant cites to language in the insurance policy stating that Defendant does not "cover any loss or occurrence in which any insured person has concealed or misrepresented any material fact or circumstances," and that the "policy is void if it was obtained by misrepresentation, fraud, or concealment of material facts."  (Doc. 35-8, p. 7 of 31.)

In Pennsylvania, a violation of a misrepresentation and concealment provision of an insurance policy similar to the one at issue here serves as a complete bar to the insured's recovery under the policy.  *See Sack v. Glens Falls Ins.,* 61 A.2d 852, 852-53 (Pa. 1984).  To void an insurance policy, the burden is placed on the insurer to prove by a preponderance of the evidence that: (1) the insured made a false representation; (2) the insured either knew the representation was false when it was made or made the representation in bad faith; and (3) the representation was material to the risk being insured.  *Millard v. Shelby Cas. Ins. Co.*, Civ. No. 02-cv-1902, 2005 WL 2035860, *4 (M.D. Pa. Aug. 24, 2005); *Saracco v. Vigilant Ins. Co.,* Civ. No. 99-cv-3502, 2000 WL 202274, *2 (E.D. Pa. Feb. 22, 2000).  "Where an insurer relies on a policy exclusion as the basis for its

denial of coverage and refusal to defend, the insurer has asserted an affirmative

defense and, accordingly, bears the burden of proving such defense." *Canal Ins.*

*Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006) (citing

*Madison Constr. Co. v. Harleysville Mut. Ins. Co.,*735 A.2d 100, 106 (Pa. 1999)).

      In the instant case, Defendant argues that Plaintiff misrepresented and

concealed numerous material facts by maintaining that he has never used the

property for business purposes and by altering his contractors' estimates.  In this

regard, Defendant relies on the testimony of Plaintiff's contractors who both

independently testified that Plaintiff stated that he used the pool barn for business

purposes, and sought to make adjustments to their estimates.  In addition,

Defendant points to Plaintiff's own deposition testimony wherein he admitted that

he is "in the horse racing business" as a professional horse trainer, despite

repeatedly representing to Defendant that he has never used the premises for

business purposes.  (Doc. 35-41, p. 25 of 112.)  Defendant also highlights that

"Plaintiff maintains an elaborate horse training facility at his property, equipped

with a special pool for training horses."  (Doc. 42, p. 7 of 24.)

      In his opposition to Defendant's motion, Plaintiff continues to maintain

that, at least prior to the loss, he never used the property for business purposes.

Furthermore, Plaintiff argues that a business pursuits exclusion is not properly

invoked to invalidate insurance coverage "where a property owner owns <u>his own</u>

thoroughbred horses and trains them to <u>occasionally</u> engage in horse races." (Doc.

46, p. 5 of 15 (emphasis in original).)  In support thereof, Plaintiff explains that,

where the applicability of a business pursuits exclusion is at issue in the Third

Circuit, "an activity encompassed within that exclusion requires two elements:

The first is continuity, or customary engagement in the activity.  The second, profit

motive, may be shown by such activity as a means of livelihood, a means of

earning a living, procuring subsistence or profit, commercial transactions or

engagements." *Canal*, 435 F.3d at 439 (quoting *Sun All. Ins. Co. of Puerto Rico,

Inc. v. Soto*, 836 F.2d 834, 836 (3d Cir. 1988).

After consideration of the parties' arguments, the court concludes that

genuine issues of material fact preclude the court from finding as a matter of law

that Plaintiff misrepresented or concealed material facts.  Although Plaintiff's

assertion that he did not use the property for business purposes prior to the loss is

contradicted by the testimony of his contractors, and, arguably by his own

testimony, the court may not make credibility determinations or engage in

weighing of the evidence.  *Anderson*, 477 U.S. at 255.  Furthermore, there is a

genuine issue of material fact as to whether Plaintiff engaged in the business of

horse racing at the time of the loss or whether that business began shortly

thereafter.  Insofar as he was engaged in the business at the time of the loss, there

is a question of material fact as to whether Plaintiff's activities on his property

22

satisfy both prongs of the business purposes exception test—continuity and profit motive—and whether Defendant's insurance policy precludes coverage to Plaintiff for claims made while he was engaged in that activity.

For the reasons set forth above, the court will deny Defendant's motion for summary judgment on Plaintiff's breach of contract claim.

## B. Bad Faith

Defendant contends that it is entitled to summary judgment on Plaintiff's bad faith claim because it had a reasonable basis for all of its claim decisions. Pennsylvania's bad faith statute allows for an insured to pursue a claim where "the insurer has acted in bad faith toward the insured." 42 Pa. Cons. Stat. § 8371. Though the statute does not define "bad faith," the Pennsylvania Superior Court has explained that "bad faith" includes "any frivolous or unfounded refusal to pay proceeds of a policy." *Kojsza v. Scottsdale Ins. Co.*, 992 F. Supp. 2d 403, 409-10 (M.D. Pa. 2014) (citing *Berg v. Nationwide Mut. Ins. Co.,* 44 A.3d 1164, 1171 (Pa. Super. Ct. 2012)) (internal citations and quotation marks omitted). Thus, "the insured must show that the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *Id.*

Although it is not necessary that the refusal to pay be fraudulent, "mere negligence or bad judgment is not bad faith." *Id.* "The insured must also show

that the insurer breached a known duty (i.e., the duty of good faith and fair dealing) through a motive of self-interest or ill will." *Id.* Conversely, "an insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions." *Id.* (citing *Post v. St. Paul Travelers Ins. Co.,* 691 F.3d 500, 522 (3d Cir. 2012) (internal citations and quotation marks omitted)). "Even questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage." *Post,* 691 F.3d at 523.

Significantly, there is a heightened burden of proof in bad faith claims, such that a plaintiff must demonstrate by "clear and convincing evidence" that an insurer acted in bad faith. *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994). The "clear and convincing" standard requires that the plaintiff show that the evidence is so "clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 367 (3d Cir. 2004) (quoting *Bostick v. ITT Hartford Grp, Inc.,* 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999)) (quotations omitted). "Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial." *Pilosi,* 393 F.3d at 367 (citing *Kosierowski v. Allstate Ins. Co.,* 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999)); *see also Anderson,* 477 U.S. at 248 ("we conclude that the determination of whether a given

factual dispute requires submission to a jury must be guided by the substantive

evidentiary standards that apply to the case.  This is true at both the directed

verdict and summary judgment stages.").

Faced with such an exacting standard, the court finds that Plaintiff

cannot defeat Defendant's motion for summary judgment on his bad faith claim.

Defendant promptly began investigating Plaintiff's claim within five days of

receiving notice.  Although it initially denied the claim, Defendant reopened it

once Plaintiff claimed to have learned of previously unknown facts related to the

cause of the damage.  Thereafter, Defendant issued payment to Plaintiff in the

amount of $102,328.19.  When Plaintiff's counsel continued to dispute the amount

of the loss, Defendant requested that the parties enter an appraisal, continued in

negotiations even after Plaintiff terminated the appraisal, retained an independent

contractor to prepare an estimate for the damages to the property, and issued an

additional check to Plaintiff in the amount of $7,506.33.  Even after Plaintiff

retained new counsel and filed the instant lawsuit, Defendant continued to

negotiate with Plaintiff in an attempt to dispose of the claim.  Although Plaintiff

argues that Defendant withdrew from the appraisal process in bad faith after

Plaintiff refused to terminate his bad faith claim, the deposition testimony of

Plaintiff's contractors provided an ample basis for Defendant's withdrawal.

As such, the court concludes that Defendant had a reasonable basis for its claim decisions and that Plaintiff has failed to show that Defendant acted in bad faith by clear and convincing evidence.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's bad faith claim will be granted.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, the court finds that genuine issues of material fact remain as to Plaintiff's breach of contract claim, and will therefore deny Defendant's motion for summary judgment as to Count I.  However, because the court finds that Defendant acted reasonably in the handling of Plaintiff's insurance claim, the court will grant judgment in favor of Defendant as to Plaintiff's bad faith claim contained in Count III.

An appropriate order will issue.

<u>   s/Sylvia H. Rambo   </u><br>
United States District Judge

Dated: November 18, 2015.